UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-60923-CIV-SNOW

RICHARD BRUCE EDISON,

    Plaintiff,

v.

NANCY A. BERRYHILL, ACTING
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

    Defendant.
_____/

**ORDER**

This cause is before the Court on Plaintiff's Complaint seeking judicial review of a final decision of the Social Security Administration denying the Plaintiff's application for disability benefits. The Complaint was filed pursuant to the Social Security Act, 42 U.S.C. § 401, et seq.

**I. PROCEDURAL HISTORY**

The Plaintiff filed an application for disability benefits on March 27, 2013, alleging disability since June 16, 2010, as a result of pain, swelling, stiffness and numbness in his hands and knees; permanent weakness, numbness and tingling in his right hand, with loss of motion and stiffness, and arthritis in the neck and knees. The application was denied initially and upon reconsideration. The Plaintiff then requested a hearing, which was held before Administrative Law Judge Elizabeth C. Palacios on April 24, 2015, and August 19, 2016. The Administrative Law Judge (ALJ) found that the Plaintiff was not disabled within the meaning of the Social Security Act. The Appeals Council, after considering additional evidence, denied the Plaintiff's request for review on March 9, 2018. The Plaintiff then filed this action seeking judicial review of the decision of the Commissioner.

## II. FACTS

The Plaintiff was born on November 2, 1952. He was 57 years old at the time of his alleged onset date and 63 on the date he was last insured. He completed medical school and his past relevant work was as a plastic surgeon. The Plaintiff alleges that his disability onset date was June 16, 2010. (R: 89, 100-101, 154, 343)

The medical record reflects that during the relevant time period, the Plaintiff began treatment with Richard Goldstein, M.D., an orthopedic surgeon, on August 14, 2008. On that date, the Plaintiff complained of pain in both knees and in his right thumb. The Plaintiff was able to play golf with a modified swing and exercise with an elliptical trainer. Dr. Goldstein's diagnositc impression was osteoarthrosis, with chondral defects to the left knee; torn medial meniscus to the right knee, with osteochondritis and probably chronic chondritis, as well as sprain to the first metacarpal phalangeal joint, right thumb. The doctor's plan included arthroscopic evaluation and treatment of the left knee, arthroscopy to the right knee at a later time, and no active treatment other than rest of the right thumb. (R:486-87)

The Plaintiff returned to Dr. Goldstein on December 4, 2008. At the time, the Plaintiff was working two days per week and was not playing golf as regularly as he was at the time of his previous visit. He worked out in a gym three times per week. The Plaintiff complained of pain in both knees, with the left worse than the right, as well as numbness and tingling to his right thumb and index finger when he performed surgery or other manual activities with his right hand. The Plaintiff reported that nerve conduction studies performed by another doctor were negative for carpal tunnel syndrome. (R:488)

Dr. Goldstein's review of X-rays and MRI studies, together with his physical examination of the Plaintiff, resulted in a diagnosis of bilateral degenerative osteoarthritis in the Plaintiff's right and left knees; early osteoarthritis of the basilar joint to the right thumb, and cervical radiculopathy on the right involving the C6 nerve root. The doctor recommended that the Plaintiff

continue with his aerobic exercise program, stop work activities which required that he stand on his feet, and discontinue his surgical practice because of the problems with his right thumb. (R:489-90)

On the Plaintiff's next visit to Dr. Goldstein on June 18, 2009, he complained of numbness in both hands, which occurred during any repetitive activity of more than 5 minutes. Review of X-rays of the Plaintiff's cervical spine revealed some degenerative changes. Dr. Goldstein diagnosed neuropathy of unknown etiology. (R:491)

On January 4, 2011, the Plaintiff presented to Harris Gellman, M.D., a specialist in surgery of the hand and upper extremity. Physical examination revealed bilateral tenderness at the thumb CMC joints; positive Tinel's sign at the wrists; negative Tinel's sign at the elbows, and positive Phalen's maneuver bilaterally. X-rays of the Plaintiff's wrists and hands were unremarkable. Dr. Gellman's diagnosis was bilateral carpal tunnel syndrome, and on January 5 and 19, 2011, respectively, he performed right and left endoscopic carpal tunnel releases. (R:466-67, 474-85)

The Plaintiff returned to Dr. Goldstein on April 26, 2011, reporting that he had not been working, and that his knees had improved significantly as long as he avoided standing and high impact activities. He was able to exercise on an elliptical machine, but did not like the treadmill. The Plaintiff told Dr. Goldstein that following his carpal tunnel surgeries, he had experienced improvement on the left side, but the right had become worse. On physical examination, the Plaintiff was able to hop equally well on either leg, and had only slight tenderness to the medial joint line of the right knee, with no palpable effusion. His grip strength was fairly good. Dr. Goldstein's impression was that the Plaintiff's condition had not appreciably changed from previous evaluations, and the Plaintiff continued to believe that he was best served by not returning to work. (R:503)

On May 9, 2011, the Plaintiff presented to Harish D. Thaker, M.D., a neurologist. Examination revealed questionably positive Tinel's sign on the right, as well as decreased pin prick in the median distribution on the right, which was somewhat inconsistent. Nerve conduction studies revealed borderline carpal tunnel syndrome on the right, the same results as when Dr. Thaker

3

conducted the same studies in 2009. Dr. Thaker determined that no further neurologic workup was needed. (R:504-05)

On August 30, 2011, the Plaintiff returned to Dr. Goldstein complaining of pain in his right thumb. The doctor was unable to hyperextend the thumb, and diagnosed the Plaintiff with trigger thumb. He treated the condition with an injection of Xylocaine and Celestone, and instructed the Plaintiff to wear a splint for one week. Dr. Goldstein administered a second injection of Celestone on October 4, 2011, anticipating that this would allow the Plaintiff to return to normal. (R:507-08)

On November 22, 2011, Dr. Goldstein administered an injection of Euflexxa to the Plaintiff's left knee. A second injection was given on November 29, 2011, and a third on December 6, 2011. (R:509-11)

The Plaintiff's next visit to Dr. Goldstein was not until April 30, 2013. He continued to report pain in his left knee, neck (radiating toward his right shoulder), and right hand. Physical examination revealed mild diffuse tenderness at the metacarpophalangeal joint of the thumb, with satisfactory range of motion and good motor strength; and mild tenderness to the medial joint line of the left knee, with no effusion, and pain with palpation to the left knee, particularly on the medial side. The Plaintiff could not hop as high on his left leg as on his right, and could not squat. He could ascend and descend a step, but not as rapidly when leading with his right leg. X-rays of the left knee showed some degenerative changes, with joint space narrowing on the medial side and some lateral osteophytes on the AP view. X-rays of the cervical spine showed some degenerative changes at C7-T1. (R:512)

Dr. Goldstein diagnosed osteoarthritis of the cervical spine with complaints of radiculopathy; osteoarthritis of the left knee, and symptoms of chronic median nerve compression to the right hand, with some chronic changes to the MCP joint of the right thumb. The doctor

recommended that the Plaintiff continue with activities to tolerance, and take over-the-counter analgesics as needed. Id.

On May 28, 2013, tests of the Plaintiff were performed at Ortho Florida, LLC. The resulting report indicated that the Plaintiff had a slow gait and normal station. He was able to button clothing, turn doorknobs, write and grip small objects. Grip strength was not specifically tested. (R:519-20)

On June 25, 2013, Bettye Stanley, D.O., a non-examining state agency physician opined that the Plaintiff retained the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently, and could stand and/or walk or sit for about 6 hours during an 8-hour workday. He had an unlimited ability to push and/or pull within the lift and carry restrictions; could frequently balance and stoop, and could occasionally kneel, crouch, crawl, and climb ramps/stairs and ladders/ropes/scaffolds. The Plaintiff had unlimited abilities to reach, handle and feel, but had a limited ability to perform fine manipulation with his right hand. He had no visual or communicative limitations, and his only environmental limitations were the need to avoid concentrated exposure to extreme cold, as well as hazards such as machinery and heights. (R:168-71)

On April 21, 2014, the Plaintiff began treatment with Frank McCormick, M.D., an orthopedic surgeon who described the Plaintiff as "a delightful 61-year-old recreational athlete who is also a physician as well." (R:551) The Plaintiff told Dr. McCormick that he had received a left knee corticosteroid injection two weeks earlier, with excellent relief. However, the Plaintiff believed that conservative measures were failing and he wished to discuss joint regeneration techniques. Id.

Dr. McCormick's physical examination of the Plaintiff indicated that his gait was normal and nonantalgic, with neutral alignment and no assistive device; there was trace medial joint line tenderness with pain in the lateral aspect of the inferior patella of the left knee; range of motion was from 0 to 120 degrees, and neurovascular system was intact. Dr. McCormick reviewed an MRI of the Plaintiff's left knee which showed a degenerative medial compartment, bone on bone, with

significant osteophyte formation and flattening. The doctor's plan was to treat the Plaintiff conservatively with corticosteroid injections. If that failed, he would consider Platelet Rich Plasma (PRP) and biologic injections, and possibly a Uni Knee. Id.

At a follow-up visit on June 2, 2014, Dr. McCormick discussed with the Plaintiff a PRP injection, to be followed by a corticosteroid injection prior to the Plaintiff's upcoming trip to Europe. The PRP injection was administered the following day. (R:547-50)

On August 4, 2014, the Plaintiff returned to Dr. McCormick seeking to alleviate some of his left knee pain before he left for Europe. The Plaintiff was interested in an intrarticular steroid injection and also was considering a surgical procedure. The Plaintiff described his pain as moderate to severe, localized in the medial compartment. Physical examination revealed full range of motion, stable ligaments and intact neurovascular system. Dr. McCormick's plan was to consider a corticosteroid injection and a future MAKOplasty. (R:544)

On October 28, 2014, the Plaintiff told Dr. McCormick that he was experiencing pain with activities of daily living and was significantly limited. The doctor believed that the Plaintiff could not work more than 30 hours per week. The plan remained the same: to begin with cortisone injections, then consider a MAKOplasty. (R:545)

On December 10, 2014, Dr. McCormick gave a sworn statement in support of the Plaintiff's claim for disability benefits. He related that the Plaintiff suffered from left knee pain, focal osteoarthritis of the knee and various malalignments of the knee. The Plaintiff's symptoms were consistent with these diagnoses and at no time did Dr. McCormick believe the Plaintiff to be malingering. After hearing the definition of light work, the doctor opined that the Plaintiff could not sustain this level of activity. Dr. McCormick assessed that the Plaintiff could stand for no more than 3 hours per day. The doctor believed that this limitation had existed for about one year prior to his first visit with Plaintiff, and that the Plaintiff's condition was unlikely to change. (R:524, 27-32)

On January 20, 2015, Dr. McCormick examined the Plaintiff again. The Plaintiff reported an aching and throbbing pain in the medial side of his left knee, radiating to the calf, to which he gave a severity rating of 8 of 10. He described this pain as constant, aggravated by walking and prolonged standing, and relieved temporarily by non-narcotic pain medication and rest. The Plaintiff complained of swelling, stiffness and limitation of actions/motion. Dr. McCormick instructed the Plaintiff to continue performing exercises for muscle strengthening and to maintain joint mobility. That same day, Dr. McCormick stated that his opinion of December 10, 2014, had not changed. (R:537, 539, 543)

On November 6, 2015, Dr. McCormick performed a bone particulate grafting, bilateral arthroscopic limited debridement, bilateral arthroscopic medial meniscectomy and a focal chondroplasty of the patellofemoral joint. Post-operative diagnoses were left knee focal osteoarthritis, left knee focal chondral defect, left knee meniscal tear, left knee focal synovitis, right knee focal synovitis, and right knee chondral defect. (R:557)

At the administrative hearing on April 24, 2015, the first witness was Dr. Arthur Lorber, a medical expert. Dr. Lorber began his testimony by summarizing the medical evidence and stating his opinion that none of the Plaintiff's impairments met or equaled any of the Listings. (R:83, 89-95)[1] Regarding the Plaintiff's residual functional capacity, Dr. Lorber opined that the Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; could stoop and crouch occasionally, but could not kneel, crawl, climb ladders, scaffolds or ropes, or work at unprotected heights or around dangerous moving machinery; could operate foot pedals with either foot a bit more than occasionally; could sit for a total of 6 hours per day, not more than 1 hour at a time; could

---

[1] The Listings of impairments referenced in 20 C.F.R. § 404.1520(d), and found at 20 C.F.R. § 404, subpart P, appendix 1.

stand/walk for a total of 4 hours per day, not more than 1 hour at a time; and could frequently perform all manipulative activities.[2] (R:95-96)

Dr. Lorber noted that in April 2014, when Dr. McCormick first began treating the Plaintiff, he had just completed his orthopedic training and had been in private practice for less than six months. He was an orthopedic surgeon, but was not Board certified, and enrolled the Plaintiff in an experimental drug trial involving plasma injections into the knee. Dr. Lorber stated that these trials and experiments had failed and had proved to be ineffective. During later visits, Dr. McCormick discussed with the Plaintiff multiple options, including surgery, but treatment involved nothing more than physical therapy to the knee. (R: 93, 97-98)

The Plaintiff testified that he graduated from medical school in 1978 and completed his residency in 1984, after which he went into private practice. He stated that he stopped working in 2008 as the result of several medical conditions. The first was cervical spine nerve compression with pain radiating from his neck to his right arm, which caused limitation of motion and stiffness in his neck. The second was bilateral carpal tunnel syndrome, with permanent nerve injury leading to numbness and loss of dexterity in his right hand. Additionally, the Plaintiff had arthritis of the right thumb, which manifested as pain, stiffness, weakness and swelling. The third condition was permanent hearing loss, which thus far had not required hearing aids. Finally, the Plaintiff suffered from osteoarthritis in both knees, with meniscal tears and, in the left knee, bone on bone contact. This caused pain, swelling and stiffness which was aggravated by standing, walking or impact of any kind. (R:101,103-05)

The Plaintiff stated that he could only walk for about 15 minutes before he had to sit down, and could not sit for more than 30 minutes. He was not able to play tennis or dance with his wife, and had moved from a house to an apartment in order to reduce the household chores. He

---

[2] Dr. Lorber was not present during the Plaintiff's hearing testimony, but was given a copy of the recording of that testimony. After review, Dr. Lorber stated that his opinion was unchanged. (R:11)

could walk for about 15 minutes before having to take a 5 to 10 minute break. The Plaintiff did not believe he could be on his feet for more than 3 hours per day. If he went out with his wife, he had to come home after a few hours. To relieve his pain, the Plaintiff was taking naproxen, Motrin, Voltaren, Mobic and glucosamine and chondroitin-sulfate. (R:105-08)

       The Plaintiff estimated that he could lift about 20 pounds, but carrying any distance would put additional pressure on his knee. On a typical day, he did a lot of reading. He also spent time with family and did some traveling. The Plaintiff was able to drive short distances and go out to lunch with his wife, but his wife did all the household chores. He rated his pain when at rest at a 2 or 3 on a 0-10 scale, but after walking around during the day it would rise to a 7. (R:109-12)

       Regarding his past work as a plastic surgeon, the Plaintiff stated that he could work while taking most of his pain medications, with the exception of Mobic, a prescription drug which can cause dizziness. However, he would not be able to stand for operations, which can take several hours. Whether standing or sitting, it was necessary for him to keep moving to prevent swelling and stiffness. The Plaintiff explained that in his profession, he did not earn money from seeing patients in his office, but rather from operating. The numbness in his right hand made surgery virtually impossible because he could not feel anything and had difficulty using the instruments. (R:112-15)

       Lorin Lovely, a vocational expert (VE), testified that the Plaintiff's past relevant work as a plastic surgeon is classified as skilled light work. The ALJ asked the VE to consider a person of the Plaintiff's age, education and work experience, who could stand or walk for one hour at a time, for a total of 4 hours during an 8-hour workday; could sit for one hour at a time for a total of 6 hours during a workday; could lift and carry 20 pounds occasionally and 10 pounds frequently; could occasionally stoop or crawl; could not kneel, crawl or climb ladders, ropes or scaffolds; could not be exposed to unprotected heights or moving machinery; could occasionally operate foot controls; and could frequently perform fingering, handling and fine manipulation. The VE testified that such a person would not be able to perform the Plaintiff's past relevant work. The VE stated that there

was other work that such a person could perform with very little vocational adjustment, such as college professor or researcher, since he had transferable skills involving knowledge of medical procedures and sciences such as biology, anatomy and physiology. However the VE testified that if the same person were required to be off task for 2 hours each day, there was no work that he or she could perform. (R:116-22)

At the supplemental administrative hearing on August 19, 2016, the VE testified again. He stated that although the Plaintiff had transferable skills to become a college professor or researcher, college professor jobs frequently begin as part-time positions, and research jobs generally require past research experience. As a result, such positions would require more than very little adjustment. However, the Plaintiff would, with very little adjustment, be able to perform the jobs of family physician and phlebotomist, which are jobs which exist in significant numbers in the national economy.[3] (R: 41, 62-70)

### III. DECISION OF THE ALJ

The ALJ first found that the Plaintiff last met the insured status requirements of the Social Security Act on June 30, 2016; he did not engage in substantial gainful activity from the alleged onset date of June 16, 2010, through the date on which he was last insured; during this period he suffered from severe impairments of degenerative discogenic disorders of the back, osteoarthritis and allied disorders of the knees, bilateral carpal tunnel syndrome, and chronic chondritis and sprain of the right thumb, but he did not have an impairment or combination of impairments which met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R:13-14)

The ALJ next determined that, through the date last insured, the Plaintiff had the residual functional capacity to perform light work, except as follows: he could lift 20 pounds

---

[3] At the August 19, 2016 hearing, the VE did not testify regarding the number of family physician jobs in the national economy. He provided this number: 24,172, in response to an interrogatory submitted by the ALJ. (R:453)

occasionally and 10 pounds frequently; could sit for up to one hour at a time for a total of 6 hours during an 8-hour workday; could stand and/or walk for up to one hour at a time for a total of 4 hours during a workday; could occasionally stoop, crouch and operate foot controls; could never kneel, crawl, be exposed to unprotected heights or moving machinery, or climb ladders, ropes or scaffolds, and could frequently use his hands for fine manipulation (fingering) and gross manipulation (handling). After recounting the hearing testimony of the Plaintiff and Dr. Lorber, the ALJ found that although the Plaintiff's medically determinable impairments reasonably could be expected to cause his alleged symptoms, the Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. (R:16-18)

In support of these findings, the ALJ began by summarizing the medical evidence pertaining to the Plaintiff's knee problems. (R:18-19) The ALJ noted that although the Plaintiff had undergone knee surgery in November 2015, only a chondroplasty rather than a total knee replacement was performed. She also emphasized that the Plaintiff's bone-on-bone arthritis was isolated to the medial compartment of the left knee, as well as clinical findings that the Plaintiff had a non-antalgic gait, full strength in the lower extremities, full range of motion and knee stability. The ALJ pointed out that the Plaintiff consistently had been treated conservatively with over-the-counter analgesics, steroid injections, strengthening exercises and PRP injections, and that his allegations of disabling knee symptoms were not consistent with his reported activities, such as driving and exercise on an elliptical machine, and his travel, including a trip to Europe. (R:19)

The ALJ also summarized the medical evidence related to the Plaintiff's allegations of disabling neck pain and stiffness, right thumb pain, and numbness and loss of dexterity in his dominant right hand. She found these allegations to be inconsistent with his activities and with the lack of evidence of nerve root impingement in the cervical spine, his satisfactory range of motion

and good motor strength in the right thumb, and the physical examinations documenting the Plaintiff's fairly good grip strength after his carpal tunnel release surgeries. (R:20)

As to the opinion evidence, the ALJ afforded great weight to the assessment of Dr. Lorber because he is a Board-certified orthopedic surgeon and his opinion was consistent with, and supported by the record evidence as a whole. Specifically, the ALJ found Dr. Lorber's opinion to be consistent with: the diagnostic imaging and nerve conduction studies documenting the Plaintiff's osteoarthritis of the knees, degenerative disc disease of the cervical spine, and carpal tunnel syndrome; the November 2015 operative report which showed that the Plaintiff's bone-on-bone osteoarhritis of the left knee was isolated to the medial compartment; the X-rays of the Plaintiff's right thumb which did not show any osseous abnormalities; Dr. McCormick's examination findings that the Plaintiff's gait was non-antalgic and symmetrical, range of motion in both knees was normal, and full strength in the lower extremities; examination findings documenting full range of motion and good motor strength in the right thumb and fairly good grip strength after the Plaintiff's carpal tunnel release surgeries; the conservative treatment of the Plaintiff without a total knee replacement, and the Plaintiff's activities. (R:21)

The ALJ accorded some weight to the opinion of Dr. Stanley, the state agency physician, who did not examine the Plaintiff but whose opinion was supported by the record evidence as a whole. However, the ALJ gave little weight to Dr. McCormick's opinions because they appeared to be based on the Plaintiff's subjective complaints and were not supported by, or consistent with, the objective medical evidence (as recounted by the ALJ in connection with Dr. Lorber's opinion). The ALJ mentioned Dr. Lorber's observations regarding Dr. McCormick: that at the time he began treating the Plaintiff, he had just completed his training in orthopedic surgery; he lacked experience, and he was using an experimental procedure of plasma injections which has proven to be ineffective. The ALJ pointed out that by contrast, Dr. Lorber has been a Board-certified orthopedic surgeon since September 14, 1973. The ALJ did give some weight to the examination

findings documented in Dr. Goldstein's treatment notes because he is a treating orthopedic surgeon and because his objective findings as to the Plaintiff's symmetric gait, ability to hop on either leg and recommendation for conservative treatment were consistent with subsequent physical examination findings. (R:21-24)

Finally, the ALJ accorded little weight to the opinion of the unidentified medical professional from Ortho Florida LLC, who had observed that Plaintiff had a slow gait, since the record did not establish the training or specialty of this individual or that he or she had any examining or treating relationship with the Plaintiff. Additionally, the ALJ noted that the physical examinations in the record did not document that the Plaintiff had a slow gait. (R:24)

Based on the testimony of the VE, the ALJ determined that the Plaintiff was unable to perform any past relevant work; was an individual of advanced age on the date he was last insured; that he had at least a high school education and was able to communicate in English; that he had acquired work skills consisting of knowledge of medicine, including biology and anatomy, and medical procedures; and, considering the Plaintiff's age, education, work experience and residual functional capacity, the Plaintiff had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy. Specifically, the Plaintiff's skills were transferable to the jobs of family physician and phlebotomist, which involve the same medical setting, tools and work process as the Plaintiff's past relevant work as a plastic surgeon, and no additional training was needed for him to perform these jobs. (R:25-27)

Based on these findings, the ALJ concluded that the Plaintiff was not under a disability, as defined by the Social Security Act, during the time period of June 16, 2010 through June 30, 2016. (R:27-28)

## IV. CROSS MOTIONS FOR SUMMARY JUDGMENT

The Plaintiff seeks reversal or remand on the grounds that the ALJ erred by according little weight to the opinion of his treating physician, Dr. McCormick, and by improperly finding that the Plaintiff's skills were transferable to the jobs of family physician and phlebotomist.

The Commissioner contends that the decision of the ALJ must be affirmed because it is supported by substantial evidence and the correct legal standards were applied.

## V. DISCUSSION

At issue before the Court is whether the final decision of the Commissioner, as reflected by the record, is supported by substantial evidence. "Even if the evidence preponderates against the Secretary, we must affirm if the decision is supported by substantial evidence." Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1985). Substantial evidence is defined as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389 (1971); Bloodsworth v. Heckler, 703 F.2d 1233 (11th Cir. 1983). The Court must review the record as a whole to determine if the decision is supported by substantial evidence. Bloodsworth, 703 F.2d at 1239. The Court must also determine whether the Administrative Law Judge applied the proper legal standards. No presumption of validity attaches to the Commissioner's determination of the proper legal standards to be applied. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993) (citing Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987)).

In making a disability determination, the ALJ must perform the sequential evaluation outlined in 20 C.F.R. § 404.1520. First the claimant must not be engaged in substantial gainful activity after the date the disability began. Second, the claimant must provide evidence of a severe impairment. Third, the claimant must show that the impairment meets or equals an impairment in Appendix 1 of the Regulations. If the claimant fails to provide sufficient evidence to accomplish step three, the analysis proceeds to step four. In step four, the ALJ must determine the claimant's residual functional capacity, then determine if the claimant can perform his or her past relevant work. The

claimant has the burden of proving the inability to perform past relevant work. If the claimant's evidence shows an inability to perform past relevant work, the burden shifts to the ALJ in step five. The ALJ must show that there is other gainful work in the national economy which the claimant can perform. Once the ALJ identifies such work, the burden returns to the claimant to prove his or her inability to perform such work.

### A. Treating Physician

The Plaintiff first argues that the ALJ erred by according little credit to the opinion of his treating physician, Dr. McCormick. The testimony of a treating physician must be given considerable weight unless "good cause" is shown to the contrary, and failure of the ALJ to clearly articulate the reasons for giving lesser weight to the opinion of a treating physician constitutes reversible error. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); 20 C.F.R. §§ 404.1527(c)(2) (2017). This Circuit has held that the requisite "good cause" exists where the treating physician's opinion is not supported by the evidence, where the evidence supported a contrary finding, or where the physician's opinion was conclusory or inconsistent with their own medical records. Lewis, 125 F.3d at 1440; Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991).

In the instant case, the ALJ gave little weight to Dr. McCormick's opinions because they appeared by be based on the Plaintiff's subjective complaints and were not supported by, or consistent with the objective medical evidence. Specifically, Dr. McCormick's opinion that the Plaintiff could stand for less than 3 hours per day was based partly on the history provided by the Plaintiff. Additionally, Dr. McCormick's operative report for the bilateral meniscectomy and focal chonroplasty in November 2015 noted that the Plaintiff's bone-on-bone ostearthritis was isolated to the medial compartment and, significantly, no total knee replacement was performed. The ALJ also emphasized that Dr. McCormick's and Dr. Goldstein's examination findings included a non-antalgic and symmetric gait, normal range of motion in both knees, 5/5 strength in the lower extremities,

stability in both knees and an intact neurovascular system. Both doctors treated the Plaintiff conservatively with over-the-counter analgesics, steroid injections, strengthening exercises and platelet rich plasma injections. The ALJ found that Dr. McCormick's opinion also was inconsistent with the Plaintiff's activities of traveling and using an elliptical machine. Finally, the ALJ noted that there was a gap in Dr. McCormick's treatment notes from January 2015 to February 2016, other than notes pertaining to the November 2015 surgery. (R:22-23)

The undersigned finds that the reasons articulated by the ALJ established good cause for according little weight to the opinion of Dr. McCormick because the opinion was not supported by the objective medical evidence. The Plaintiff argues that Dr. McCormick's opinion was bolstered by Plaintiff's own testimony of disabling pain. The ALJ "must consider a claimant's subjective testimony regarding pain if he finds evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain." Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) citing Mason v. Bowen, 791 F.2d 1460, 1462 (11th Cir. 1986). However, the ALJ may reject a claimant's testimony regarding pain as not credible, and that determination must be upheld if it is supported by substantial evidence. Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984).

The ALJ in this case found that although the Plaintiff's medically determinable impairments reasonably could be expected to cause his alleged symptoms, the Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. This finding was based on the reasons articulated by the ALJ for according little weight to the opinion of Dr. McCormick. The undersigned finds that the ALJ's assessment of the Plaintiff's credibility is supported by substantial evidence in the record and should not be disturbed.

### B. Transferability of Skills

The Plaintiff next contends that the ALJ erred in finding that the Plaintiff's skills were transferable to the jobs of family physician and phlebotomist. The Plaintiff asserts that the hypothetical presented by the ALJ to the VE was incomplete because it failed to include the limitations assessed by Dr. McCormick. For the reasons discussed in the preceding section, the undersigned concludes that the ALJ was not required to incorporate Dr. McCormick's opinion into the hypothetical presented to the VE. The Plaintiff also argues that the ALJ incorrectly determined that the Plaintiff could perform the jobs of family physician or phlebotomist with very little vocational adjustment.

The Commissioner often meets her burden of showing that other jobs exist in the national economy that a plaintiff can perform by relying on the Medical-Vocational Guidelines ("grids"), 20 C.F.R. § 404, Subpt. P, App. 2. Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).[4] Grid Rule 202.00(e) states that the "presence of acquired skills that are readily transferable to a significant range of semi-skilled or skilled work within an individual's residual functional capacity would ordinarily warrant a finding of not disabled regardless of the adversity of age." However, Rule 202.00(f) provides that "[f]or a finding of transferability of skills to light work for persons of advanced age who are closely approaching retirement age (age 60 or older), there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings, or the industry."

Grid Rule 202.07 indicates that an individual of advanced age, who is a high school graduate or more with transferable skills is not disabled, but under Rule 202.06, the same individual without transferable skills is deemed disabled. In Zimmer v. Commissioner of Social Sec., 211 Fed. Appx. 819 (11th Cir. 2006) this Circuit has observed:

---

[4]The Medical-Vocational Guidelines are referenced in 20 C.F.R. § 404.1569, and found at 20 C.F.R. § 404, subpart P, appendix 2.

> Whether an individual of advanced age (over age 55) has transferable skills "depends largely on the similarity of occupationally significant work activities among different jobs." Transferability is most likely among jobs that require the same or a lesser degree of skill, utilize the same or similar tools, and use the same or similar products, processes, or services. Complete similarity among all these factors is not necessary for transferability.

Id. at 820 (citations omitted). The Court went on to note that "[a]n ALJ relies on the testimony of a vocational expert (VE) to determine what level of skill the claimant achieved in his past work, whether the claimant has transferable skills, and whether the claimant can perform other jobs." Id.

Program Policy Statement SSR 82-41 (S.S.A.) was issued to clarify and explain the concepts of "skills" and "transferability of skills." The ruling states, in ¶ 4c, that in order to establish transferability of skills for individuals age 60 and older who are limited to light work exertion, "the semiskilled or skilled job duties of their past work must be so closely related to other jobs which they can perform that they could be expected to perform these other identified jobs at a high degree of proficiency with a minimal amount of job orientation."

In the instant case, the Plaintiff points out several skills listed in the Dictionary of Occupational Titles (DOT) definition of "General Practitioner," DOT 070.101-022 (ECF No. 19-3) which are absent from the definition of "Surgeon," DOT 070.101-094 (R: 412, and ECF No. 19-2).[5] The Plaintiff also notes that the definition of "surgeon" does not include the drawing of blood, adding that "it is well known that physicians do not actually draw blood." (ECF No. 19 at 19)

The undersigned notes that in connection with the Plaintiff's previous application for disability benefits, the denial of which was affirmed in Case Number 12-60560-CIV-WILLIAMS/SELTZER ("Judge Williams case"), the ALJ had determined that the Plaintiff had acquired the transferable skills of "analyzing, reviewing medical records and reports, reviewing x-

---

[5]As observed by the Eleventh Circuit, in Washington v. Comm'r of Soc. Sec., 906 F.3d 1353, 1357 n 2 (11th Cir. 2018), the Department of Labor previously was responsible for compiling the DOT, but stopped producing new editions as of 1999, and the Social Security Administration is developing a new Occupational Information System to replace the DOT.

rays, and understanding of medical terminology as well as counseling techniques." (ECF No. 16 at 15)  Magistrate Judge Barry Seltzer, when recommending that the ALJ's decision be affirmed, considered the same arguments as those presented here regarding the weight accorded to the treating physician (in that case Dr. Goldstein) and the transferability of skills acquired by the Plaintiff as a plastic surgeon. As to the latter argument, Judge Seltzer stated, "The VE's assertion [that the Plaintiff had transferable skills] comports with common sense; it is difficult to conceive of many professions that bestow on a practitioner a greater number of transferable skills." Id. at 27.

While it is arguable that the Plaintiff might have more than "very little vocational adjustment" in moving from the job of plastic surgeon to that of family physician, he clearly could move seamlessly into the job of phlebotomist.  Although it may be true that many doctors do not regularly draw blood, the Plaintiff does not contend that he was never taught this skill or that he could not immediately re-familiarize himself with it. Notably, although the Plaintiff quotes selectively from the definition of phlebotomist ("Draws blood ... Assembles equipment ..."), DOT 079.364-022, his selective quotation highlights that the work requires relatively simple medical tasks. It is inconceivable that the Plaintiff's skills as a plastic surgeon would not enable him to perform these relatively simple medical tasks with little or no vocational adjustment. Accordingly, the undersigned concludes that the ALJ was entitled to rely on the VE's testimony, which was consistent with the DOT,  that the Plaintiff has transferable skills which would allow him direct entry into the job of phlebotomist.

## VI. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

ORDERED and ADJUDGED that Defendant's Motion for Summary Judgment (ECF No. 21) be GRANTED, and the Plaintiff's Amended Motion for Summary Judgment (ECF No. 19) be DENIED. Further, Plaintiff's Motion for Summary Judgment (ECF No. 18) is DENIED as moot.

DONE and ORDERED at Fort Lauderdale, Florida, this 12th day of February, 2019.

_____
LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record